**STATE**

v.

**Tyrone SCHOLL.**

No. 93–200–C.A.

Supreme Court of Rhode Island.

June 23, 1995.

Jeffrey Pine, Atty. Gen. and Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeal by the defendant, Tyrone Scholl (defendant or Scholl), from a judgment of conviction on two charges, the robbery of Clive Browne and the felony murder of Clive Browne. A jury found Scholl guilty of both crimes. The trial justice denied the defendant's motion for a new trial and sentenced him to life imprisonment for the felony-murder conviction.[1]

We affirm the judgment of the Superior Court. The facts of the case insofar as pertinent to this appeal are as follows. Additional facts will be furnished as needed to deal with specific issues raised in support of the defendant's appeal.

On March 12, 1991, at approximately 7 p.m. Clive Browne (Browne) was attacked and robbed in an elevator at Parenti Villa, a public apartment building for the elderly, handicapped, and disabled. Browne was seventy-three years old at the time, confined to a wheelchair, and a resident of Parenti Villa. Browne did not report the incident to anyone on the night it happened. When his home-health care provider arrived the next morning at approximately 9 a.m., she summoned Judith Petronio (Petronio), the management aide at the complex. As soon as Petronio saw Browne "stumbling over in pain in his bed," she went to her office (Browne did not have a telephone) and called the rescue service.

Two rescue technicians from the Providence fire department, Timothy Printer (Printer) and Lieutenant Louis Courtermache (Courtermache), responded to the call. Printer testified that when he first arrived at the apartment, Browne was sitting on his bed and appeared to be in pain. After failing to find Browne's blood pressure and realizing that he was in extreme pain, Printer and Courtermache radioed the Roger Williams Medical Center and, using the rescue sirens, transported Browne to that hospital.

Courtermache testified during voir dire that when he asked Browne what had happened to him, Browne stated that he had been attacked the night before and was beaten and punched in the stomach. When asked why he had not reported the incident to anyone the night before, Browne stated that he had not wanted to bother anyone. Because they could not determine Browne's blood pressure and because his stomach was very hard, both technicians suspected internal bleeding.

Detective John Corley (Corley) of the Providence police department spoke with Browne shortly after he had been transported to the Roger Williams emergency room. Corley testified that Browne told him that the previous evening when he was riding the elevator, another man got in. As soon as the doors closed, the man proceeded to punch Browne in the stomach several times and took twelve dollars from him. Browne described his attacker to Corley as a white male, five feet eight inches tall or taller, having a husky build and reddish-blond hair, and not cleanly shaven. Corley testified that Browne told him that he would be able to identify his attacker.

After meeting with Browne, Corley met two fellow officers, Sergeant Bathgate and Detective McGehearty (McGehearty) at Parenti Villa and checked the visitors sign-in log. McGehearty, who had been assigned to the case, recognized two names in the visitors log, Luigi Ricci's and defendant's, and knew defendant fit the description given by Browne. McGehearty went directly to the

---

1. As both sides indicate in their briefs, the trial justice refused to dismiss the robbery charge (although it merged with the felony-murder conviction) prior to the defendant's appeal. The trial justice reasoned that in the event the felony-murder conviction was overturned on appeal, the defendant could still be retried for both robbery and felony murder. No sentence was imposed for the robbery conviction, however.

police station and assembled two photo packs, one pack containing a picture of Luigi Ricci and the second pack containing a picture of defendant.

At approximately noon McGehearty returned to Roger Williams hospital with the two photo packs. After obtaining permission to meet with Browne, McGehearty asked him if he would be able to identify his attacker. McGehearty testified that Browne said yes because "he had seen [his attacker] in the building on prior occasions." Since Browne had intravenous lines in both his arms, McGehearty held the pictures for Browne and showed him each picture individually. Browne did not recognize or identify anyone from the first photo pack, which contained the picture of Luigi Ricci and five other photographs. McGehearty showed Browne the second photo pack, which had five pictures including one of defendant. When Browne saw defendant's picture, he "reached up and grabbed the photo, said 'Yes, yes, that's the face, those are the eyes.'" McGehearty then asked Browne if he recognized the man in the picture (defendant) to be the same person who had assaulted him. Browne replied, "I want to say yes. The hair is different so I can't swear to it." Browne said he would be able to make a positive identification if he saw a more recent photograph or the actual person.

Although McGehearty obtained a more recent photograph and returned to the hospital the next day, he was not permitted to speak to Browne. Browne underwent surgery the day after the attack and never regained consciousness. He was pronounced dead four days later on March 17, 1991.

At trial the state introduced the testimony of Gwendalyn Fuller, who was working as a security guard at Parenti Villa the night that Browne was attacked. She testified that on March 12, 1991, at 7 p.m. she saw Luigi Ricci and defendant sign the visitors log book on their way into the building. She further testified that she saw them sign the same log book at 7:10 p.m. on their way out of the building. In addition, the state presented the testimony of Clarissa DeAngelis, a professional document examiner, who testified that in her opinion Scholl was the person who

signed his name in the log book on the night in issue. The state also offered the testimony of Dr. William Sturner (Sturner), who was the chief medical examiner for the state of Rhode Island from 1974 through 1991 and had performed the autopsy on Browne. He testified that in his opinion the cause of death was peritonitis caused by a rupture in the intestinal wall. Sturner further testified that the injuries found during the autopsy were all consistent with Browne's recently having been struck in the abdomen. He testified that the blows to Browne's abdomen administered with a moderate degree of force would have been enough to cause the injuries, and that in his opinion the manner of death was homicidal.

The defendant bases his appeal on three arguments. He maintains that the trial justice committed reversible error by finding that Browne's statements describing his assailant and statements he made during the photo-identification procedure with McGehearty were admissible. He claims that Browne's extrajudicial statements of identification were not properly admitted under either the dying-declaration exception or the "declaration of a decedent made in good faith" exception to the hearsay rule. Although defendant concedes the fact that he was present at Parenti Villa, visiting Ricci's mother from 7 p.m. until 7:10 p.m. on the night of March 12, he denies any involvement in the attack on Browne. The defendant's second argument is that Rule 804(c) of the Rhode Island Rules of Evidence is unconstitutional as applied to him and to all criminal defendants. Finally, defendant argues that even if Browne's statements did qualify as exceptions to the hearsay rule, they should have been barred by R.I. R.Evid. 602 since the statements were too uncertain and tentative.

■ The Sixth Amendment to the United States Constitution affords a criminal defendant the right to confront witnesses offered against him or her. *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This right, which includes the right to cross-examine witnesses, was made applicable to the states by the Fourteenth Amendment. *See id.; see also* R.I. Const.,

art. 1, sec. 10. "The strict requirement of confrontation in the Sixth Amendment, however, is tempered by the dictates of practicality and judicial economy." *State v. Burke*, 574 A.2d 1217, 1222 (R.I.1990) (citing *Ohio v. Roberts*, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597, 605–06 (1980)). When hearsay evidence is sought to be introduced the defendant's right to confrontation is, therefore, examined on a case-by-case basis, and hearsay evidence will be admitted only if it is found to be sufficiently reliable. *State v. Manocchio*, 497 A.2d 1, 7–8 (R.I. 1985); *see also* Fed.R.Evid. 803, 804; R.I. R. Evid. 803, 804 (hearsay exceptions).

■ One well-established exception to the rule against hearsay is the dying-declaration exception. *See State v. Gazerro*, 420 A.2d 816, 822 (R.I.1980) (citing *State v. Sullivan*, 20 R.I. 114, 118, 37 A. 673, 675 (1897)). The basis for this exception is that the death of the declarant creates a need for the evidence. *Id.* at 822 (citing *McCormick's Handbook of the Law of Evidence* § 282 at 680 (2d ed. Cleary 1972)). The guarantee of reliability inherent in a dying declaration is based upon the belief that most people are inclined to tell the truth if they are aware of their impending death. *See id.*

Before such hearsay evidence becomes admissible, it must be found to satisfy the requirements of Rule 804(b)(2) of the Rhode Island Rules of Evidence. That rule reads:

> "(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (2) *Statement Under Belief of Impending Death.* In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death."

Rule 804(b)(2), adopted in 1987, expanded the common-law circumstances for the admissibility of a dying declaration, which had limited the exception to criminal cases where the declarant's death had actually occurred. *See Gazerro*, 420 A.2d at 819 n. 2.

■ In the instant case, defendant argues that Browne's statements of identification were not admissible into evidence because Browne, although he knew he was seriously ill, did not have the sense of an imminent, certain death required by Rule 804(b)(2). The defendant cites to testimony that describes Browne as "jovial" on the morning after his attack when the rescue personnel arrived at his apartment. He further argues that while Browne was at the hospital, no one conveyed to him the serious nature of his medical problems. Despite these arguments the trial justice's finding of Browne's expectation of impending death was supported by the evidence.

■ In *Gazerro* this court revisited the various methods of determining whether a declarant's statements were made "under the sanction of impending death." *Gazerro*, 420 A.2d at 822 (quoting *Sullivan*, 20 R.I. at 118, 37 A. at 675). First, the declarant's state of mind can be directly proved by his or her express language. *Id.* at 822; *Sullivan*, 20 R.I. at 118, 37 A. at 675. For example, in *State v. Pailin*, 576 A.2d 1384 (R.I.1990), the out-of-court statements of a stabbing victim, who subsequently died from his injuries, were admitted into evidence at trial. The declarant's awareness of impending death was evidenced by his statements, "I'm dying. I'm dying," and "He stabbed me, I'm going to die." *Id.* at 1385. In the instant case, Browne made several statements to the rescue personnel regarding his medical condition.

Courtermache, the rescue technician, testified during voir dire that Browne told him several times that he (Browne) was not going to make it to the hospital. Printer, the other rescue technician, testified that Browne had told him more than once "that he wasn't going to survive this, he had lived long enough." He further testified that Browne was very serious about his condition and very nervous when the technicians started "working on him" (establishing an intravenous, applying an oxygen mask, and hooking up a cardiac monitor). Courtermache and Printer both testified that although Browne was in extreme pain, he initially seemed somewhat

jovial. They also testified, however, that Browne's attitude changed when they began to treat him and he became very nervous and seemed to be giving up.

■ In addition to or in the absence of direct statements by the declarant, the surrounding circumstances may permit an inference regarding the declarant's state of mind. *Gazerro*, 420 A.2d at 822; *Sullivan*, 20 R.I. at 118, 37 A. at 675. In such cases, substantial weight and deference are given to the trial justice's findings of fact. *Gazerro*, 420 A.2d at 822 (citing 5 Wigmore, *Evidence* § 1442 at 298–301 (Chadbourn rev.1974)). Although the evidence regarding Browne's express language standing alone may not have been sufficient to prove his state of mind, the surrounding circumstances permitted an inference that Browne was aware of his impending death.

Browne was seventy-three years old at the time of his attack and subsequent death. The technicians who treated him testified that they could not find a blood pressure and, suspecting internal bleeding, immediately transported Browne to the nearest hospital. The staff at the hospital was aware of Browne's condition and went out to meet the rescue vehicle when it arrived at the emergency room. Browne was in extreme pain, his stomach was hard, and he was very pale. Furthermore, there was testimony at trial regarding the extensive amount of medical treatment that he required.

Detective Corley of the Providence police department testified that when he went to the emergency room and spoke to Browne about the attack, Browne had five or six medical personnel treating him. Doctor Michael Bonatati (Bonatati), the physician on duty at the emergency room, testified during voir dire that he and up to three nurses treated Browne for several hours. Furthermore, Browne required surgery the same day he was taken to the emergency room and was therefore placed in the intensive care unit to await the surgery. Given Browne's age, the extreme pain he endured, the obvious seriousness of his injuries, and the extensive medical attention and treatment he received, it is reasonable to infer that Browne was aware of his impending death.

A dying declarant's state of mind may also be inferred when the declarant hears statements regarding his or her medical condition. *Gazerro*, 420 A.2d at 823 (citing *Sullivan*, 20 R.I. at 118, 37 A. at 675). In the instant case, Bonatati spoke to Browne when he arrived at the emergency room. Bonatati testified that although ethical considerations prevented him from telling patients that they will probably die, he did tell Browne, "You are very, very sick. We are going to do all we can do to stabilize you."

When one considers all the evidence, it is clear that the trial justice's finding of expectation of impending death was supported by the evidence. The statements of identification were thus properly admitted as dying declarations.

■ The defendant next contends that the trial justice erred in finding that Browne's statements were admissible under the good-faith exception to the hearsay rule, Rule 804(c). Furthermore, defendant contends that Rule 804(c) is unconstitutional as applied to him and to all criminal defendants since it violates the right of confrontation. Since Browne's statements qualify as dying declarations, we shall only briefly address this issue. Rule 804(c) states,

> "*Declaration of Decedent Made in Good Faith.* A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

As this court stated in *State v. Burke*, Rule 804(c) applies in all criminal and civil cases and is not limited to statements that describe the cause or circumstances of a declarant's impending death. *Burke*, 574 A.2d at 1222 (citing *Advisory Committee's Note*, Rule 804(c)). Although the exception applies to all cases, hearsay evidence will only be admitted if certain constitutional safeguards are met. *Id.*

■ The right of a criminal defendant to confront and cross-examine witnesses, although not absolute, "is an essential and fundamental requirement for the kind of fair

trial which is this country's constitutional goal." *Id.* (quoting *Pointer v. Texas,* 380 U.S. at 405, 85 S.Ct. at 1068, 13 L.Ed.2d at 927). The United States Supreme Court, in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), established a two-tier test to determine the admissibility of out-of-court statements. *Id.* at 65–66, 100 S.Ct. at 2538–39, 65 L.Ed.2d at 607–08. When the declarant is not present at trial, the confrontation clause normally requires that he or she be shown to be unavailable. *Id.* at 65, 100 S.Ct. at 2538, 65 L.Ed.2d at 607. There is no doubt in the instant case that Browne was unavailable at trial.

Second, even after a showing that declarant is unavailable, the out-of-court statements must possess adequate "indicia of reliability" in order to be admissible. *Id.* at 65–66, 100 S.Ct. at 2539, 65 L.Ed.2d at 607–08. In the instant case, even if Browne's statements had not fallen within the dying-declaration exception, they possessed the "particularized guarantees of trustworthiness" necessary to satisfy constitutional requirements. *See id.* at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608; *Burke,* 574 A.2d at 1223.

Browne gave the same description of his attacker to two detectives with whom he spoke. He told McGehearty he would be able to identify his attacker since he had seen him at Parenti Villa on prior occasions. When he saw the picture of defendant, Browne grabbed the photo and said "[Y]es, yes, that's the face, those are the eyes." Browne's good faith was evident by his reluctance to "swear" that defendant was his attacker because the hair in the picture was different from that in his memory. Even though McGehearty had planned to show Browne another photograph of defendant, the trial justice properly found that the statements Browne made describing his assailant and those made during the photo-identification procedure satisfied the good-faith requirement of Rule 804(c). In addition, as required by Rule 804(c), Browne's statements were made before the commencement of the action and based upon his personal knowledge. In the instant case, Browne's statements possess the necessary indicia of reliability to satisfy the requirements of both

*Ohio v. Roberts* and Rule 804(c). The defendant's constitutional rights were therefore adequately safeguarded, and the trial justice did not abuse his discretion in admitting Browne's statements.

█ Finally, defendant argues that even if Browne's statements were admissible under one of the above hearsay exceptions, they were not reliable and should have been excluded. The defendant maintains that Browne lacked personal knowledge and that his statements were too tentative and uncertain to have been received into evidence. He relies on *State v. Ranieri,* 586 A.2d 1094 (R.I.1991), in support of his argument.

In *Ranieri* a seventy-three-year-old woman and her neighbor, who had attempted to help her, were attacked in the woman's home at four o'clock in the morning. Approximately five days after the attack the *Providence Journal (Journal)* reported that police had arrested Eric Ranieri (Ranieri) for the crime. Along with the report the *Journal* published a picture of Ranieri. At least one subsequent article in the newspaper also included a picture of Ranieri. Although for eighteen months the victim maintained that she never saw her assailant, the trial was continued on its first day because she suddenly came forward and offered to identify the defendant as her assailant. *Id.* at 1096–97.

In that case the defendant, basing his argument on Rule 701 of the Rhode Island Rules of Evidence, claimed that the witness's identification was unreliable and should have been suppressed since it was similar to an expression of an opinion by a lay witness. This court rejected defendant's Rule 701 argument and properly addressed the issue as a question of witness competency under Rule 602. *Id.* at 1097–98. Rule 602 states in pertinent part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

The victim in *Ranieri* maintained for eighteen months that she could not identify her attacker. *Id.* at 1099. There was also testimony at trial by the neighbor and police that no light of any kind was on in the apartment. The victim herself was hesitant to say with certainty that a light had been on that night.

*Id.* at 1096. Furthermore, the victim testified at trial that she did not remember her neighbor's being in her apartment on the night of the attack. *Id.* at 1099.

Unlike the victim in *Ranieri*, Browne had personal knowledge of his attacker. He gave a detailed description of his assailant to at least two police detectives. He stated that he would be able to identify his attacker since he had seen him at Parenti Villa on prior occasions. When Browne saw the photograph of the defendant, he said that the face and the eyes were the same as those of his assailant. Finally there was testimony at trial that the elevators at Parenti Villa, where Browne was attacked, were well lit. Relying upon this evidence, the trial justice clearly had sufficient evidence to find that Browne had personal knowledge of his attacker.

Browne's identification of the defendant combined with the defendant's presence at Parenti Villa at the time of Browne's assault constitute adequate evidence to support the findings of the trial court. For the reasons stated, the judgment of the Superior Court is affirmed and the defendant's appeal is denied. The papers in the case may be remanded to the Superior Court.

BOURCIER, J., did not participate.